## Case No. 7,494.

JONES v. SEARS. WELSH v. SAME. MALONEY v. SAME.

[2 Spr. 43.] [1]

District Court, D. Massachusetts. Dec., 1861.

---

[1] [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]

[1] [Reported by John Lathrop, Esq., and here reprinted by permission.]

R. R. Bishop, for libellants.
H. A. Scudder, for respondent.

SPRAGUE, District Judge. These are three libels heard together. I shall first consider the case of Jones. Four distinct causes are included in his libel: 1. Wages earned before the 22d February; 2. Damages for unlawful discharge and imprisonment in a foreign port; 3. Clothing converted by the captain or lost by his fault; 4. Damages for personal injuries inflicted, as he charges, by the captain.

1st. As to the wages earned before the 22d February, the claims of all the libellants stand upon the same ground. It appears by the master's account-book and suppletory oath, that, when they were discharged, a small sum was due to each of the libel-lants for wages previously earned, which sum the master paid to the American consul at St. Thomas; and the defendant contends that this is such a payment to or for the benefit of the seamen as will exonerate the master from further liability. The question is, these men having been sent ashore and discharged, is a payment to the American consul at that port, of wages then earned and due, a payment to the seamen? It not appearing that this was by the request of the seamen, or that the proceeds ever came to their use, I know of no law by which the master can shield himself by such payment.

2d. The unlawful discharge and imprisonment. One ground taken by the respondent is that the sending ashore was not by his order. I think the evidence establishes that the master did send the men ashore. The mate's testimony clearly proves that it was done by his express order; but it would make no difference in my mind if it were not. Nobody had power to send the men ashore but the master, except the master of the port, who might do it for the violation of the local law. It is not pretended that he did it or ordered it to be done, nor was it done for the violation of the local law. The master alone had command of the vessel and crew, and with this exception was responsible for them; and whatever he suffered any one without right to interfere and do, he became directly responsible for as his own act. The sending ashore, and the imprisonment of the men, were the acts of the master.

This being so, was there any justification for it? Nothing justifies such an act but necessity. The general rule is that a master in a foreign port may discharge seamen if he cannot retain them on board with safety; but not otherwise. If they are dangerous men, this would justify the master in discharging them or confining them on shore.

Take the case of Jones. Was he a dangerous man? In the first place, there is no evidence that he had ever misconducted himself before. All the evidence is the other way, and goes to show that up to this time he had properly conducted himself on board the ship. Again, this was an extraordinary occasion,—a festive one; the master was entertaining his friends, and Jones and Maloney went ashore and came back with his permission. It is alleged that while on shore they became intoxicated; if it be so, that does not show that they were dangerous men, which is the question. Now at the time the men were put in irons and sent ashore, what was the condition of affairs on board the ship? Jones had been entirely disabled and prostrated by a blow upon the head; Maloney was disabled by a blow and gash in his eye,—both these were insensible or nearly so from near the beginning of the affray to the time they were taken off the ship,—and Welsh is not shown to have been

a dangerous man. A prudent and discreet captain, before sending these men ashore and to a foreign jail, should at least have kept them on board till the next morning, and seen how they were after the effect of their intoxication had passed away.

Courts certainly cannot sanction or countenance intoxication. And yet it is perfectly evident that masters of ships cannot deal with it as it can be dealt with on shore. It is perfectly well known that sailors do get intoxicated; masters hire them with this knowledge; suffer them to go ashore with this knowledge; and with this knowledge furnish them money to spend ashore. I was once much struck by the reply of a seaman of more than ordinary intelligence, to. a question put him upon the witness stand in regard to the crew of his vessel being upon an occasion under the influence of liquor. "Yes," he said, "we were drunk; the captain knew we were going to get drunk, and furnished us money to get drunk with." He meant that the captain furnished the crew money to go ashore, knowing their almost invariable tendencies in the use of it. Masters know the habits of sailors; owners get their services at a less price for these very habits; year after year they serve at a mere pittance because of them; and to say that, as between master and sailor or owners and sailor, you are to hold the crew to the same degree of responsibility, and deal with them with the same severity, as men on shore, would be very unjust. And yet we cannot say that seamen may get intoxicated at their pleasure. There is great difficulty in dealing with the question and in drawing the line. This may be said,—that, upon a festive occasion like the one at St. Thomas, an intoxicated sailor is not to be treated with the same severity for wrongful acts which might properly be applied to a sober man. Jones is therefore entitled to recover for his wrongful discharge and imprisonment.

3d. As to the clothing. It is shown by the testimony of the mate that the clothing was sent ashore by order of the master, and it does not appear that it ever reached Jones. Being wrongfully sent from the ship by the master's direction, and never reaching its owner, the master is responsible for its conversion.

4th. That Jones received a severe blow upon the head there can be no doubt. Was it inflicted by the respondent? Is this proved? The libel alleges that it was; the answer, that it was not. Both are under oath, and no inference can be drawn on behalf of either. Two witnesses, Welsh and Maloney, testify directly that the blow was given by the defendant, and this would generally be sufficient to establish the fact. But there is. evidence directly contradicting this. The last witness upon the stand, who was sitting upon the galley, testifies that he saw another man,—a captain,—whose ap-

pearance he describes, strike the blow with a pitch-pine stick; and there is the evidence of another captain, that this blow was struck by a captain, but not by the respondent, together with the tendency of the other evidence, introduced on behalf of the respondent, to show that he never left the quarter-deck. Therefore the testimony of the two witnesses for the respondent neutralizes that of the two for the libellant, and —while we cannot say it is proved that the captain did not strike this blow—the burden of proof being upon the libellant, it is not made out by a preponderance of the evidence that he did.

The amount which Jones should recover is, wages earned prior to the 22d February, the time of the unlawful discharge; what he would have earned as wages from the 22d February to the time of his arrival in the United States; the value of his clothing; and a further sum as damages for being sent to jail when he did not merit it. It does not appear that he suffered greatly from the confinement. But considering his physical condition, which rendered him a fitter subject for the hospital than a jail, something certainly should also be decreed for this. I shall therefore decree, in all, to Jones the round sum of one hundred dollars.

Next the case of Welsh, who claims for wages due on the 22d February, and for damages for the unlawful discharge, only. In regard to the allegation of drunkenness, which is made of him also, the remarks already made respecting Jones are applicable. It is to be further observed that the liquor which Welsh drank was furnished him on board.

The evidence is that, after Jones was struck down, Welsh was on the quarterdeck, and uttered threats, though there is no evidence that he threatened the master until he was put in irons. He was willing to submit to being ironed if the mate directed it. Welsh had always been a good man on board, and never committed any offence before. In this matter he hurt nobody. He took no lead in the matter. Ryan had taken the lead, and it would perhaps seem proper that he should have been sent ashore. Jones and Maloney made the mistake of sympathizing with and helping Ryan. Welsh was the last to come up and help. His conduct was not such as to render him a dangerous man on board; and his discharge and confinement were therefore unjustifiable. In addition to the wages due Welsh on the 22d February, I shall allow him, as damages, what he would have earned on board ship during his confinement in jail and until his arrival in this country, or $55.50. I shall not allow anything additional for suffering in jail or hardship in being sent there, as he appears to have been well treated, and was not, like Jones, in a condition to need medical attendance and nursing when sent.

The case of Maloney, who makes the same two claims as Welsh, is peculiar. He was sent to the hospital,—not to the jail,—and properly so sent. He was insensible, and suffering greatly from a blow, struck not by the master and from no fault of his. The hospital was therefore the proper place for Maloney, and to be sent there was for his benefit. He therefore can only recover the wages due on the 22d February.

Decree for wages and damages in accordance with the foregoing opinion, with full costs in the cases of Jones and Welsh, and part costs in Maloney's case.